IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15–cv-01054–MSK-KMT

LAKEVIEW RENOVATIONS, INC. dba NORTH AMERICAN PROPERTY SERVICES, INC.,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipal corporation, and
SHEILA DIDUCH,

     Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Magistrate Judge Kathleen M. Tafoya**

     This case comes before the court on Defendants' "Motion to Dismiss Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and to Compel Compliance with Contractual Dispute Resolution Procedure." (Doc. No. 24 ["Mot."], filed July 21, 2015.) Plaintiff has filed a response (Doc. No. 36 ["Resp."], filed August 28, 2015), to which Defendants have replied. (Doc. No. 41 ["Reply"], filed September 11, 2015.)

## STATEMENT OF THE CASE

     Plaintiff is a commercial janitorial and cleaning services company, commonly referred to as NAPS. (Doc. No. 23 ["Am. Comp."] at 2.) Plaintiff is operated by a Korean individual and a high percentage of its employees are also Korean. (*Id.*) As Defendants in this action, Plaintiff

has named the City and County of Denver (the "City") and Sheila Diduch, who served as a

Prevailing Wage Investigator for the Office of the Auditor.  Though not formally named as a

defendant, Clay Vigoda was, at all times relevant to this lawsuit, employed by the City as the

Director of Government, Community Affairs and Prevailing Wage and was also Defendant

Diduch's supervisor.

Plaintiff held a contract for its services with the City beginning in 2010 until 2015 when

its contract was not renewed.  (Am. Comp. at 3, 10.)  The contract incorporated a prevailing

wage requirement adopted by the City that specifies a base hourly rate and a rate for multiple

"fringe benefits" applicable to various positions, including a custodian.  Defendant Diduch began

her employment as a Prevailing Wage Investigator in early 2010 and was assigned to Plaintiff.

(Am. Comp. at 4.)

Plaintiff contends that from the beginning of her assignment, Defendant Diduch subjected

it to discriminatory treatment by refusing to timely pay multiple invoices for Plaintiff.  (Am.

Comp. at 4-5.)  As an example, Plaintiff alleges that in 2012, Defendant Diduch withheld

payment for 161 invoices, totaling hundreds of thousands of dollars.  (*Id.*)  Plaintiff further

alleges that Defendant Diduch required Plaintiff to improperly reimburse its employees,

misclassify employees and improperly compensate employees during breaks, all of which

resulted in overpayments totaling over $800,000.00. (Am. Comp. at 3-6.)

Plaintiff contends that Defendant Diduch's conduct and actions toward Plaintiff were

based on discriminatory racial animus.  Plaintiff alleges that in May 2012, Defendant Diduch

stated to one of Plaintiff's employees that it was a "bad company" and that "she was working on

taking this company of out of the city."  (Am. Comp. at 5.)  Plaintiff also asserts that in June

2012, Defendant Diduch went to one of the City locations where Plaintiff's janitors were working and stated, "I hate Koreans."  (Am. Comp. at 5.)

On several occasions, Plaintiff requested that Mr. Vigoda review Defendant Diduch's decisions regarding payment of their invoices and Mr. Vigoda refused, responding that he supported Defendant Diduch's payment determinations and that she made the final determination.  (Am. Comp. at 6.)  In January 2013, Plaintiff informed Mr. Vigoda of Defendant Diduch's discriminatory statements and requested Mr. Vigoda assign a different investigator to Plaintiff.  (*Id.*)  Mr. Vigoda ignored Plaintiff's request.  (*Id.*)  Thereafter, Defendant Diduch began communicating and meeting with Rafael Gongon, a representative for the Service Employees International Union ("SEIU"), the union representing Plaintiff's employees.  (Am. Comp. at 6.)

In May 2013, Plaintiff submitted a detailed memorandum to the Auditor from Plaintiff's counsel showing that Defendant Diduch's requirement that it pay a higher fringe benefit rate to its employees was inaccurate and unsupported by law.  (Am. Comp. at 6.)  The Auditor acknowledged the error.  (*Id.*)  At that point, Plaintiff was able to begin paying the correct fringe benefit rate.  (*Id.*)

On September 10, 2013, Mr. Vigoda and Defendant Diduch drafted a letter including false information about Plaintiff for the City's Auditor and presented it to Adrienne Benavidez, the City's Manager of General Services, copying each member of the Denver City Council and the Mayor.  (Am. Comp. at 7.)  Plaintiff contends that in the letter, Mr. Vigoda and Defendant Diduch misrepresented several of Plaintiff's actions, as well as accusing Plaintiff of bad faith and being morally corrupt.  (*Id.*)

Before Plaintiff could respond to the letter submitted to Ms. Benavidez, or an investigation could occur, the Auditor sent a copy of the letter to the Denver Post.  (*Id.*)  On September 18, 2013, based on encouragement from Defendant Diduch, the SEIU picketed in front of the Wellington Webb building.  (Am. Comp. at 7.)  On September 19, 2013, the Denver Post published an article based on the Auditor's letter.  (*Id.*)  On that same day, Plaintiff's representatives met with Mr. Vigoda and Denis Berckefeld, Director of Communications of the Office of the Auditor, to inform them of Defendant Diduch's discriminatory conduct, to dispute the false accusations in the Auditor's letter and provide them with sworn statements from two employees who heard Defendant Diduch make the statement, "I hate Koreans."  (*Id.*)  Within two hours of this meeting, Defendant Diduch contacted Mr. Gongon *via* email and in reference to SEIU's picketing, stated, "Good job yesterday!  Now I need your help.  [Plaintiff] is playing dirty, so I am going to need to produce tons of documentation, including some statements from your workers."  (*Id.*)

On October 4, 2013, Ms. Benavidez reported that she had thoroughly investigated the allegations within the Auditor's letter and concluded Plaintiff had not breached its contract.  (*Id.*)  Plaintiff contends that Mr. Vigoda never investigated its allegations regarding Defendant Diduch's discriminatory conduct, nor did he inform the City Attorney of the same until several months later.  (Am. Comp. at 9.)  Plaintiff further alleges that in retaliation for Plaintiff's report of Defendant Diduch's discriminatory conduct, Mr. Vigoda continuously attempted to present negative information to the Auditor and Denver City Council pertaining to Plaintiff in order to prevent a future contract between the City and Plaintiff.  (*Id.*)  On October 21, 2014, Mr. Vigoda

stated in an email regarding the Denver City Council, "It seems pretty clear they will never agree to NAPS being chosen as the preferred bidder.  So I think they are out no matter what!"  (*Id.*)

Plaintiff has submitted numerous requests and a formal invoice to the City seeking reimbursement for the overpayments that occurred at Defendant Diduch's direction.  (Am. Comp. at 10.)  However, the City has refused to reimburse Plaintiff for the same.  (*Id.*)  Additionally, Plaintiff participated in the bid process for a new contract with the City in 2015 but its contract was not renewed.  (*Id.*)

By this action, Plaintiff asserts claims under 42 U.S.C. §§ 1981, 1983 against Defendant Diduch and the City based on racial discrimination and retaliation.  (Am. Comp. at 10-15.)  Additionally, Plaintiff asserts a breach of contract claim against the City based on Defendant Diduch's requirement that Plaintiff pay the incorrect fringe benefit amount and failing to timely pay Plaintiff, as well as the City's failure to pay and/or reimburse Plaintiff for the correct fringe benefit amount.  (Am. Comp. at 15.)

## LEGAL STANDARDS

### 1.  Failure to State a Claim Upon Which Relief Can Be Granted

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1198 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. *Id*. at 679-81. Second, the Court considers the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id*. at 679.

Notwithstanding, the court need not accept conclusory allegations without supporting factual averments. *Southern Disposal, Inc., v. Texas Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). "Where a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted). "[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Id.* (internal quotations omitted).

## 2.  Lack of Subject Matter Jurisdiction

Rule 12(b)(1) empowers a court to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case.  Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  A court lacking jurisdiction must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking.  *See Basso*, 495 F.2d at 909.  The dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006); *see also Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) (noting that dismissals

for lack of jurisdiction should be without prejudice because a dismissal with prejudice is a disposition on the merits which a court lacking jurisdiction may not render).

A Rule 12(b)(1) motion to dismiss must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction. *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). When considering a Rule 12(b)(1) motion, however, the Court may consider matters outside the pleadings without transforming the motion into one for summary judgment. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995). Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's factual allegations . . . [and] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). *Id.*

## ANALYSIS

### 1. 42 U.S.C. Section 1981

"Section 1981 forbids all intentional racial discrimination in the making and enforcement of private or public contracts." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004). *See* 42 U.S.C. § 1981(a). Making and enforcing contracts is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "[Section] 1981 'offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship.'" *Muller v. Islands at Rio Rancho Homeowners Ass'n*, 564 F. App'x 411, 414 (10th Cir. 2014) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)). Essentially, the "law

8

prohibits racial discrimination in contracting for anything by anyone." *Tillman v. Murphy*, No. 11–cv–00196–WYD–CBS, 2012 WL 4755356, at *3 (D. Colo. Sept. 5, 2012) (internal quotations omitted).

Additionally, independent contractors can state a discrimination claim under § 1981. *See Bolden v. City of Topeka*, 441 F.3d 1129, 1134–37 (10th Cir. 2006) (ruling, however, that claim against municipality for violation of § 1981 must be brought under § 1983). To prove a claim under § 1981, an independent contractor must prove that because of racial animus it was denied "benefits, privileges, terms, [or] conditions of the contractual relationship." 42 U.S.C. § 1981(b); *see also Brown*, 581 F.3d at 181–82 (elements of § 1981 claim "are generally identical" to those for a Title VII claim). Finally, an independent contractor can also state a claim under § 1981 for retaliation against it. *See Webster v. Fulton Cty.,* 283 F.3d 1254, 1257 (11th Cir.2002) (independent contractor can state a claim for violation of § 1981 when it is not awarded a contract in retaliation for filing a § 1981 discrimination lawsuit).

### a. Racial discrimination claim against Defendant Diduch

Plaintiff contends that Defendant Diduch discriminated against Plaintiff based on the race of its owner and majority of its employees. It further contends that her discriminatory conduct interfered with the performance of Plaintiff's contract and resulted in its subsequent loss of the same.

"A § 1981 . . . plaintiff must prove by a preponderance of the evidence that the defendant intentionally discriminated against him or her on the basis of race." *Juarez v. ACS Gov't Sols. Group, Inc*., 314 F.3d 1243, 1245 (10th Cir. 2003) (internal quotations and citations omitted). Such proof may come from "either direct evidence of discrimination (*e.g.*, oral or written

statements on the part of a defendant showing a discriminatory motivation) or indirect (*i.e.,* circumstantial) evidence of discrimination." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1225 (10th Cir. 2000) (citations omitted).

Plaintiff has alleged both direct and circumstantial evidence of discrimination on the part of Defendant Diduch.  According to Plaintiff, Defendant Diduch continuously withheld payments to Plaintiff without a justifiable reason, at one point totaling hundreds of thousands of dollars.  (Am. Comp. at 4.)  She made numerous unfounded demands on Plaintiff related to employee compensation, resulting in overpayments totaling in excess of $800,000.00.  (Am. Comp. at 4-6.)

Defendants argue that any action resulting in overpayment to Plaintiff's employees, the majority of whom are Korean, is evidence Defendant Diduch was not acting with discriminatory intent.  (Mot. at 6-7.)  However, Plaintiff is not bringing a claim on behalf of or based upon discriminating actions toward its employees.  Plaintiff's claim is based upon his allegation that due to Defendant Diduch's discriminatory animus, she interfered with his right to make and enforce his contract with the City.  Between Defendant Diduch's alleged refusal to timely pay Plaintiff's invoices and her required overpayments, her actions were costing Plaintiff almost $1 million.  Such financial harm and constant administrative difficulty would certainly interfere with Plaintiff's ability to enforce and perform its contract with the City.

Further, Defendant Diduch communicated with a union representative and employees allegedly to disrupt Plaintiff's employee relations.  (Am. Comp. at 6-7.)  She assisted in drafting a letter for the Auditor that purportedly included allegations that Plaintiff had breached its contract with the City but, upon investigation by the City's Manager of General Services, it was

determined Plaintiff had not breached its contract.  (Am. Comp. at 7, 8.)  This evidence of discrimination is supported by direct statements from Defendant Diduch in which she specifically indicated that she was trying to get Plaintiff out of the City and that she hates Koreans.  (Am. Comp. at 5.)

The court finds Plaintiff has set forth sufficient allegations of discrimination to survive Defendants' Motion to Dismiss.

### b. Racial discrimination claim against the City

"A municipality or other local government may be liable under [§ 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or causes a person 'to be subjected' to such a deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).  "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell*, 436 U.S. at 691. Instead, to establish municipal liability, a plaintiff must show: (1) the existence of a municipal policy or custom; and (2) a direct causal link between the policy or custom and the constitutional injury alleged.  *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)).  The existence of a policy or custom can be established by more than one means, including demonstrating the existence of

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to

adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted).

Plaintiff purports to rely upon the third and fourth factors to allege municipal liability in the present case.[1]  With regard to the third and fourth factor, Plaintiff contends that Defendant Diduch had final decision-making authority regarding enforcement of the prevailing wage, including withholding payments and requiring unfounded overpayments from Plaintiff, because Mr. Vigoda refused to review her decisions.  (Resp. at 7, 9-10.)  It also alleges that Mr. Vigoda had final decision-making authority as the Executive Manager of the Prevailing Wage Division because the City gave him the City's final decision-making authority to monitor and oversee compliance with the City's prevailing wage ordinance.  (Resp. at 9-10.)

Only "under appropriate circumstances" may "a single decision by policymakers . . . be sufficient to create liability under § 1983."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211 (10th Cir. 2007).  As the Tenth Circuit has explained:

> While *Monell* found liability on the basis of an official policy as the moving force of the constitutional violation, it fell to the [Supreme] Court in *Pembaur* to establish that actions taken by a municipality's final policymakers also represent acts of official policy giving rise to municipal liability. . . . . An act by a municipality's final policymaking authority is no less an act of the institution than the act of a subordinate employee conforming to a preexisting policy or custom. As the Court in *Pembaur* explained, '[n]o one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy.'

---

[1] In its Response, Plaintiff mentions the fifth factor as a basis for municipal liability for the first time.  Plaintiff did not plead any allegations in its Amended Complaint related to this theory of liability.  Therefore, the court will not address this theory.

*Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (internal citations omitted)); *see also Thomas v. City of Snyder*, No. 95-6252, 1996 WL 662453, at *4 (10th Cir. 1996) ("[W]hen a municipal official who is 'responsible for establishing final policy with respect to the subject matter in question' makes 'a deliberate choice to follow a course of action . . . from among various alternatives,' municipal liability will attach to that decision.") (quoting *Pembaur*, 475 U.S. at 483-84); *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) ("In the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued.").

The decision as to whether an official has "final policymaking authority" is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). The Tenth Circuit has identified three factors to consider when deciding whether someone has final policymaking authority: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (internal quotation marks omitted). "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481-83 (citation omitted). "The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id.*

13

Plaintiff states in its Amended Complaint that the Prevailing Wage Section of the Auditor's Office controls and oversees compliance with the City's prevailing wage requirements. (Am. Comp. at 2.)  As Executive Director of the Prevailing Wage Division, Mr. Vigoda must inevitably possess a significant amount of authority with regard to the enforcement of the prevailing wage.  However, using the general principles suggested by the Tenth Circuit, it is clear that neither Mr. Vigoda nor Defendant Diduch were final policymakers within the meaning of § 1983.  Plaintiff's own allegations indicate that in May 2013, it took the issue of Defendant Diduch's decisions regarding the rate of fringe benefits Plaintiff was required to pay to the Auditor.  (Am. Comp. at 6.)  Plaintiff states that the Auditor "acknowledged the error and Plaintiff was able to then pay the correct fringe benefit rate to its employees on a going forward basis."  (*Id.*)

Thus, unlike those cases where the Tenth Circuit has found § 1983 liability based upon a finding that the decision was made by a final policymaker, see *Flanagan v. Munger*, 890 F.2d 1557, 1568–69 (10th Cir.1989) (finding § 1983 liability where discipline decisions of police chief "for all intents and purposes" were final "and any meaningful administrative review is illusory."), Mr. Vigoda and Defendant Diduch's decisions were undoubtedly subject to review under apparently meaningful procedures.

### c.  Retaliation claim against Defendant Diduch

"To establish a prima facie case of retaliation, [a] plaintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse . . . action; and (3) there is a causal connection between the protected activity and the adverse . . . action." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1183 (10th Cir. 2002) (quotation omitted)

(applying elements in employment context).  Plaintiff contends that Defendant Diduch retaliated against it following its report to Mr. Vigoda of Defendant Diduch's discriminatory statements. Defendant Diduch argues that, based on the Amended Complaint, Plaintiff cannot meet the causation element of this claim.  (Mot. at 11.)  Her treatment of Plaintiff was discriminatory prior to this report and thus, her later actions were merely a continuation of the same.  (*Id.*)

Based on the Amended Complaint, prior to January 2013, Defendant Diduch's discriminatory actions toward Plaintiff were limited to monetary transactions, *i.e.*, unfounded demands resulting in Plaintiff's consistent overpayment of fringe benefits and refusing to timely pay its invoices.  (Am. Comp. at 4-5.)  Plaintiff informed Mr. Vigoda of Plaintiff's discriminatory statements toward Plaintiff in January 2013.  (Am. Comp. at 6.)  At that point, the nature of Defendant Diduch's actions toward Plaintiff, at least according to the Amended Complaint, changed.

In 2013, Defendant Diduch began communicating on several occasions with the SEIU representative in order to disrupt Plaintiff's employee relations, including encouraging public picketing.  (Am. Comp. at 6-8.)  Later that year, Defendant Diduch and Mr. Vigoda began compiling false information about Plaintiff and included the same in a letter they drafted for the Auditor and submitted to Ms. Benavidez, the City's Manager of General Services.  (Am. Comp. at 7.)  Following Plaintiff's report, Defendant Diduch took repeated steps to attempt to damage the relationship between Plaintiff and the City and prevent a future contract between the City and ultimately, Plaintiff's contract was not renewed.  (Am. Comp. at 7.)

The court finds Plaintiff has presented sufficient allegations to support the causation element of its retaliation claim against Defendant Diduch.

**d. Retaliation claim against the City**

In requesting the court dismiss Plaintiff's retaliation claim, the City argues again that Mr. Vigoda and Defendant Diduch are not final decision-makers for purposes of §1983 and therefore, the City cannot be liable for their retaliatory actions. The court agrees, with the exception of Plaintiff's claim as it relates to the non-renewal of its contract.

Plaintiff argues that following its report of Defendant Diduch's discriminatory statements, Defendant Diduch and Mr. Vigoda took repeated and concerted action to harm the Plaintiff's relationship with the City and prevent the City from renewing Plaintiff's contract. (Am. Comp. at 7-10; Resp. at 13-14.)  Plaintiff also alleges that their actions are the reason why the Auditor made every effort to ensure that Plaintiff's contract would not be renewed and are why the contract was not renewed.  (Am. Comp. at 10.).

Plaintiff's allegations clearly support a "cat's paw" theory of liability.  *See Staub v. Proctor Hospital*, 562 U.S. 411, 415 n.1 (2011).  "In the employment [] context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger an unlawful employment action.  *E.E.O.C. v. BCI Coca–Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006). The innocence of the decision-makers would not spare the employer from liability. As applied here, the subordinates' bias would have to be driven by retaliatory motive.  *See Crowe v. ADT Security Services*, 649 F.3d 1189, 1194–95 (10th Cir. 2011).  Plaintiff has set forth sufficient allegations supporting this theory of liability.

**2. Breach of Contract**

Plaintiff brings a breach of contract claim against the City based on Defendant Diduch's failure to timely pay Plaintiff's invoices and to recover the $800,000-plus in overpayments resulting from Defendant Diduch's requirement that he pay incorrect fringe benefit rates.  The City requests the court dismiss this claim and compel Plaintiff's compliance with §5.21 of their contract, which provides, "All disputes between the City and [Plaintiff] regarding this Agreement shall be resolved by administrative hearing pursuant to the procedure established by D.R.M.C. §56-106(b), *et seq.*  For the purposes of that procedure, the City official rendering a final determination shall be the Manager."  Plaintiff raises a futility objection to compliance with §5.21, arguing that it has already presented its breach of contract claim to Ms. Benavides, the Manager, and she denied the same.  Plaintiff also contends that the provision is unconscionable under principles of arbitration enforcement based on the fact that the claim is not presented to a neutral third-party but instead, to the City's own Manager.

D.R.M.C. §56-106 provides that any person who disputes a determination made by or on behalf of Denver may submit a written petition to the Manager of Public Works for a hearing. *Id.* at (b), (c). If the petition is granted, the Manager or her appointee conducts a hearing where the parties may present evidence, including sworn testimony, and both parties are given the opportunity to cross-examine witnesses. *Id.* at (d).  The rules of evidence and standard of proof correspond to those in civil, nonjury cases in district court.  *Id.*  After this hearing, the Manager makes a final determination which is reviewable for questions of law and fact by the Denver District Court by order or writ under C.R.C.P. 106(a)(4) procedures.  *Id.* at (e), (f).

In *City and Cty. of Denver v. Dist. Court in and for City and Cty. of Denver*, 939 P.2d

1353 (Colo. 1997), the court heard similar challenges as those presented by Plaintiff to

enforcement of the administrative procedures under D.R.M.C. §56.106.  *Id.* at 1361.  The court

acknowledged that the procedures provide for "a Denver official, rather than a decision-maker

unrelated to either party, to determine the merits of PCL's claims.  However, this will not render

a dispute resolution clause invalid so long as the ADR clause provides for judicial review of the

official's determination."  *Id.* at 1365 (citing *Kiewit W. Co. v. City and Cty. of Denver*, 902 P.2d

421, 424 (Colo. App. 1994) (upholding a virtually identical ADR clause in a contract for the

construction of the runways at DIA because it provided for judicial review and because it was

"entered into voluntarily by competent and informed parties")).  The court agrees.  Additionally,

in light of the fact that the Manager's decision is subject to judicial review, the court also finds

that compliance with §5.21 would not be inherently futile, as Plaintiff claims.

In entering into the contract, Plaintiff specifically agreed to comply with the dispute

resolution procedures contained within D.R.M.C. §56-106.  Plaintiff has not presented any

reasonable basis to avoid compliance with the same.[2]

WHEREFORE, for the foregoing reasons, this court respectfully

**RECOMMENDS** that Defendants' "Motion to Dismiss Amended Complaint Pursuant to

Fed. R. Civ. P. 12(b)(1) and (6) and to Compel Compliance with Contractual Dispute Resolution

Procedure" be **GRANTED** in part and **DENIED** in part.  Plaintiff's claims under 42 U.S.C. §

1981 based on racial discrimination and retaliation should proceed, Plaintiff's claim under 42

---

[2] In its Response, Plaintiff requests that should the court conclude it is bound by §5.21, the court
stay this action as to its breach of contract claim.  However, in making said request, Plaintiff
failed to address the factors this court typically considers in determining whether to stay an
action. Thus, this request should be denied.

U.S.C. § 1981 based on retaliation should proceed, Plaintiff's claim under 42 U.S.C. § 1981 against Defendant City and County of Denver based on racial discrimination should be dismissed and Plaintiff's breach of contract claim should be dismissed.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579–80 (10th Cir. 1999) (stating that a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059–60 (stating that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52

F.3d 901, 904 (10th Cir. 1995) (holding that cross-claimant had waived its right to appeal those portions of the ruling by failing to object to certain portions of the magistrate judge's order); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (holding that plaintiffs waived their right to appeal the magistrate judge's ruling by their failure to file objections). *But see Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (stating that firm waiver rule does not apply when the interests of justice require review).

Dated this 22nd day of February, 2016.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge